## DE PATER v. UNITED STATES.

Circuit Court of Appeals, Fourth Circuit.
July 26, 1929.

No. 2745.

Helen Elizabeth Brown and R. Palmer Ingram, both of Baltimore, Md. (Samuel S. Levin, of Baltimore, Md., on the brief), for appellant.

A. W. W. Woodcock, U. S. Atty., of Baltimore, Md.

Before WADDILL and NORTHCOTT, Circuit Judges, and WATKINS, District Judge.

WATKINS, District Judge. The testimony in this case discloses the following undisputed facts:

On May 13, 1927, on information that he was violating the law, four prohibition agents went to the home of John De Pater near Shipley Station, Anne Arundel county, Md. This was an ordinary two-story frame farmhouse situated on a small hill about 50 yards from a country road from which a private driveway led up to the dwelling around which there was no inclosure. The officers drove up and stopped their car at the corner of the house near the kitchen. As they were alighting, De Pater came out of the house and walked toward them. At that time they detected the odor of mash. They informed De

Pater who they were, and told him that they had a complaint that he was running a still. This he denied. Whereupon the officers stated that they could smell mash, to which he replied that they could not smell mash, that it was just garbage and stuff around the yard where they had been feeding chickens. They then asked permission to go into the house and "satisfy" themselves. He replied that they could not do this without a warrant. The officers then walked toward the kitchen door. Meanwhile, De Pater's wife had locked the kitchen door behind her husband after he came out of the house, and she then began nailing up the windows. Thereupon the officers walked around to the kitchen, where they encountered a strong odor of mash. After qualifying as experts, they testified that the odor was that of whisky mash fermenting and not cooking. Just above the kitchen was a room with ordinary wooden shutters, all closed. None of the shutters to the other rooms were closed. The officers stated that they could smell mash very distinctly, and again asked permission to go up and see what was in the room, stating that they did not need a search warrant. They were again informed that they could not enter without a warrant. Thereupon one of the officers climbed up on a porch which was on a level with the second story window of the room on which the shutters were closed and fastened. He encountered a strong odor of mash, and then pulled open the shutter and looked in and found a plant, not in operation, including a 50-gallon still, 10 gallons of whisky, a number of barrels of whisky mash, a gasoline heating apparatus, pump, pressure tank, burners, and also a kettle. Two of the officers testified that they had no search warrant for the premises, and saw De Pater commit no violation of the law in their presence. It was shown by the testimony that De Pater had previously entered a plea, of guilty of manufacturing and possessing intoxicating liquor in violation of the National Prohibition Law, and in the instant case he was found guilty, inter alia, of a second offense of manufacturing whisky, constituting a felony. The evidence of what was discovered by the search was admitted over timely objection by the defendant and after a motion to suppress the evidence had been overruled. The sole question at issue is whether this evidence was obtained by an illegal or unreasonable search and was improperly admitted.

In determining this question it is important that the controlling facts and circumstances surrounding this particular case be constantly borne in mind, and that the decision be limited to the exact point at issue. It will be observed at the outset that, when advised by their sense of smell of what was going on within the residence, the officers did not arrest De Pater, and that the search was not made as an incident of a lawful arrest, although he was admittedly the owner of, and in immediate control of, the premises at the time. The record is silent as to whether he was taken into custody without a warrant immediately after the search or whether he was arrested upon a warrant thereafter sworn out. He was certainly not arrested until after the disclosures revealed by the search. The search, therefore, was not an incident of a lawful arrest, and its legality is not in any way supported by evidence that there was a contemporaneous arrest upon disclosures revealed by the search; nor was the object of entering the house to arrest Mrs. De Pater, then known to be therein and actively engaged in an effort to exclude the officers from the building. The case is further distinguished from a number of the decided cases, in that consent to the entry of the officers was not only refused, but they were positively forbidden to search the premises without a warrant.

It is too well determined to require argument that knowledge of a crime may be acquired through the sense of smell alone. Malacrauis v. U. S. (C. C. A. 4th Circuit) 299 F. 253; McBride v. U. S. (C. C. A. Ala. 1922) 284 F. 416, certiorari denied (1923) 261 U. S. 614, 43 S. Ct. 359, 67 L. Ed. 827; Schulte v. U. S. (C. C. A. La. 1926) 11 F. (2d) 105. It is a matter of common knowledge, however, that the degree of certainty of such evidence necessarily depends upon the circumstances of each particular case. Had this case been tried alone upon the testimony of the officers as to the knowledge acquired by their sense of smell, it might have justified a submission of that question to a jury and a verdict of guilty at their hands upon certain counts in the indictment. In such case, however, there would have been excluded from the consideration of the jury the supplemental testimony showing what was discovered by the forcible entry into the residence. In passing upon the question of whether the search was legal or reasonable, the court cannot escape drawing certain conclusions from the course pursued by the officers themselves and their testimony as to what actuated them in the course pursued. It is especially significant that they did not arrest De Pater, and it must be reasonably assumed that they were not willing to arrest him for a crime committed in their

presence upon what was discovered by the sense of smell alone. They desired confirmation of the opinion which was engendered by this discovery. They requested De Pater to allow them "to go in the house and satisfy ourselves." In the testimony the knowledge thus acquired was referred to as an opinion of what they had smelled. We may reasonably conclude, therefore, from the testimony that, instead of positive knowledge of a crime committed in their presence, there existed only a strong suspicion and well-defined opinion that such was the fact. Their purpose in entering the house, therefore, was not to arrest parties engaged in committing a crime in their presence, but for the purpose of verifying their opinion, or, as was stated to De Pater, for the purpose of satisfying the officers that their suspicions were well founded. In most of the decided cases in which officers have acted upon the sense of smell, it was confirmed before search by other evidence, such as sight of vessels containing the liquid, of persons at work, of steam issuing from a still in operation, or hearing persons at work. The detection and identification of the odor of fermenting whisky mash arose from its penetrating and enduring strength, an odor which would permeate a closed room, and capable of being detected and identified long after the mash had been removed, especially if the empty vessels were allowed to remain. There evidently existed such serious doubt of the accuracy of their suspicions that the odor was that of whisky mash, or else that the crime was still in progress, as to deter them from arresting the defendant without confirmation by search.

The case was fully and ably argued on behalf of both appellant and appellee. We deem it unnecessary to review and analyze in detail the numerous cases presented in briefs of counsel. One of the leading cases relied upon by appellee is that of McBride v. U. S., supra. In that case, as in most of the other cases relied on by the government, in which the search was made without a warrant, there was no entry of a private residence. The officers had come to a large inclosure on the gate of which was a sign, "Vicious Dog. Hail before Entering." Inside was an unoccupied dwelling house and a smaller inclosure containing a stable or barn some distance from the road and from the dwelling. The officers found no signs of any dog or persons, and they entered the gate and proceeded to the stable. When about to enter the stable lot, they perceived the fumes of whisky in the process of manufacture, and, entering, they discovered a trapdoor leading to a cellar be-

low the stall, and saw a light and the steam of whisky being manufactured coming out. They found in the cellar a 75-gallon still being then operated by two negroes. McBride thereafter drove up, and, being informed what had been done, stated that the negroes were innocent, that he himself was responsible for the operation of the still, was the owner of the premises, and that no one lived on them at the time. The court held that the case did not involve the taking of papers or the use of any papers or property of the defendant in evidence against him. It further held that the entry on the premises and into the stable was *not to search for evidence* but, upon ascertaining that whisky was in the process of manufacture, to arrest those engaged in the commission of an offense then in progress. They were then arrested, and McBride's own confession voluntarily made was a sufficient basis for the conviction.

One of the very recent cases decided by this court is Henderson v. U. S., 12 F.(2d) 528, 51 A. L. R. 420. In that case government agents had information that the defendant was unlawfully dealing in narcotic drugs. They went near the store of the defendant, part of which was occupied by him as a residence, and sent two informers with marked money to purchase cocaine from him. They waited near the store, and in a short while the informers returned and reported that they had made the purchase, and delivered the cocaine, which they had purchased, to the officers. They then went into the store and notified the defendant that they were going to place him under arrest for the illegal sale of narcotics, and demanded that he tell them where the money was which had been paid him. He refused to give any information, and protested their right to search without a warrant. They thereupon arrested him, made a search, and found the marked money on a dresser in defendant's bedroom. It was held that the primary purpose of the officers in going to the premises was to make a search and not for the purpose of making an arrest, and that the search could not be held reasonable as incidental to a lawful arrest. The court very properly held that the real object of the officers was shown by their conduct, and that it was for the purpose of search and not of arrest, and that they could not by arresting do indirectly what they could not do directly. After discussing the safeguards thrown around private residences not only by the Constitution but also by statutory provisions, the court quotes with approval the language of Mr. Justice Butler in Agnello v. U. S., 269 U. S. 20, 46 S. Ct. 4, 6, 70 L. Ed. 145, 51 A.

L. R. 409, to the effect that "the search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws."

In the very recent case of Benton v. U. S. (C. C. A. 4th Circuit) 28 F.(2d) 695, the uncontradicted evidence showed that three prohibition officers went to the home of the defendant at night and secreted themselves in some vines outside of defendant's yard. At daybreak, they heard a pump being used in a woodshed some ten steps from 'defendant's dwelling house, and saw the defendant and others carrying a 5-gallon can from the woodshed to an automobile. They entered the defendant's yard and arrested him and a boy, and seized the can, which was filled with whisky still warm. The officers then went into the woodshed and found a large quantity of whisky, and on the premises outside found several more barrels of whisky. The defendant admitted that the whisky was his. As stated by the court, there was no evidence that the dwelling house was entered. The correctness of the decision that the evidence was admissible is not to be questioned. The officers had ample reason to satisfy them that the 5-gallon can contained whisky; the defendant was arrested for a crime committed in their presence, and there was no search of the private residence.

It would too greatly extend the length of this opinion to attempt to analyze and distinguish the numerous cases involving the right of search. A few decisions of the lower courts have maintained the right to search a private residence where officers are informed by the sense of smell alone that a crime is being committed therein. We think no case can be found, however, of any controlling authority approving the right of such search under circumstances similar to those presented herein. The great majority of cases hold otherwise, and their decisions are supported by the soundest of reasoning. Even independently, therefore, of the weight to be given to the provisions of the National Prohibition Law prohibiting the issue of search warrants for private residences without knowledge of sales being committed therein, and which precluded the obtaining of a search warrant under the facts here disclosed, and the subsequently enacted statute providing for the punishment of officers making illegal searches of private residences, we are constrained to hold that the search in this case was illegal, and the evidence of what it disclosed should have been excluded.

If any doubt could have existed under the provisions of the Constitution alone and the interpretations placed thereon by the Supreme Court, we think such doubt is effectively removed by the provisions of the statutes above referred to relating to the enforcement of the liquor laws. It is not the province of this court to inquire into or question the wisdom of Congress in enacting these provisions. We must determine the law as we find it, even though the result be greatly to hamper and embarrass officers in their efforts to curb the manufacture or illegal possession of whisky in private homes. Before its adoption, the National Prohibition Law was the subject of long and vigorous debate by both branches of Congress, and the restriction on the right of searches of private residences was not only provided by section 25 of title 2 of that act (27 USCA § 39) but further emphasized by section 6 of the supplemental act of 1921, 42 Stat. 222 (18 USCA § 53). In determining the legality of searches and seizures under that law, the Supreme Court has carefully outlined the effect to be given these provisions. In the case of U. S. v. Berkeness, 275 U. S. 149, at page 155, 48 S. Ct. 46, 48 (72 L. Ed. 211), it is said:

"The emphatic declaration that no private dwelling shall be searched except under specified circumstances discloses a general policy to protect the home against intrusion through the use of search warrants."

And in the Agnello Case, supra, the court said:

"Save in certain cases as incident to arrest, there is no sanction in the decisions of the courts, federal or state, for the search of a private dwelling house without a warrant."

The complete review of the decided cases on the subject, which was made by the court in that case, and the especially clear and forceful review contained in the Henderson Case, supra, renders it both unnecessary and inadvisable that we should further review the authorities. The effect of the decisions, while recognizing the right of search as an incident of a lawful arrest, is to require the utmost caution in the search of private residences and to require as a prerequisite thereto such a degree of certainty of the knowledge of both the nature and the instant perpetration of the crime as the officers herein failed to exhibit and as the evidence failed to disclose in the instant case.

Reversed.

NORTHCOTT, Circuit Judge (dissenting). In Benton v. United States, 28 F.(2d) 695, this court held that the sense of smell was sufficient to justify a reasonably cautious man, in whom the sense of smell was highly trained, in believing that a crime like that in

the instant case was being committed in his presence. A full discussion of the use of the various senses in detecting crimes of this character will be found in that case. Here the officers swore they became convinced from their sense of smell that a still was being operated in one of the rooms of the De Pater house. This being true, it seems only reasonable that, guided by the sense of smell, they could look into the room where the still was, and that, having their sense of smell supported by the sense of sight, they could enter and seize the still. It was for the jury to decide as to the reasonableness of the testimony of the officers. This the jury did decide, and found the defendant guilty. The right of officers to stop the commission of a crime carried on in their presence cannot be doubted. Their sense of smell convinced them that a crime was being committed in their presence, and they proceeded in a perfectly rational and normal way to prevent the continuing crime.