William **SPINELLI**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 18389.

United States Court of Appeals
Eighth Circuit.

July 31, 1967.

Rehearing Denied Sept. 12, 1967.

Irl B. Baris, of Newmark & Baris, St. Louis, Mo., for appellant.

Sidney M. Glazer, Attorney, Dept. of Justice, Washington, D. C., for appellee; Richard D. FitzGibbon, Jr., U. S. Atty., and Stephen H. Gilmore, Asst. U. S. Atty., St. Louis, Mo., and Fred M. Vinson, Jr., Asst. Atty. Gen., Theodore George Gilinsky, Washington, D. C., on the brief.

Before VOGEL, Chief Judge, and VAN OOSTERHOUT, MATTHES, BLACK-MUN, MEHAFFY, GIBSON, LAY and HEANEY, Circuit Judges, sitting en banc.

GIBSON, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Eastern District of Missouri convicting appellant of violating 18 U.S.C. § 1952 (Interstate travel in aid of racketeering).

Appellant was tried before a jury on an indictment which charged that he had traveled in interstate commerce with intent to promote, manage, establish, carry on, and facilitate the promotion of an unlawful activity, to-wit: a business enterprise involving gambling in violation of the law of Missouri, § 563.360, R.S.Mo., 1959, V.A.M.S.; and did thereafter perform and attempt to perform acts to promote, manage, establish and carry on, and facilitate the promotion, management, establishment and carrying on of said unlawful activity. He was found guilty by the jury and sentenced by the Court to three years imprisonment and a $5,000.00 fine.

The appeal from that judgment was initially argued before a division of this Court consisting of Judges Van Oosterhout, Gibson, and Heaney. Contrary to the holding of the District Court, the panel agreed that appellant had standing to object to a search of an apartment room that he was not actually occupying, and the majority of that panel, in an opinion authored by Judge Heaney, ruled that the conviction of appellant should be reversed as evidence seized in that room was the result of an unconstitutional search. The majority felt that the affidavit in support of the search warrant did not establish probable cause. On this point Judge Gibson dissented. The numerous other points of error alleged by appellant were not considered by the panel because of the dispositive nature of the majority holding on the search warrant issue.

Thereafter, the government petitioned the Court for a rehearing en banc. Owing to the importance of the question and the division of opinion on the panel, a rehearing en banc was ordered. At this point appellant contends that a rehearing violates his constitutional protection against double jeopardy. As the government cannot generally appeal actions by the trial court, appellant contends the government cannot "appeal" decisions reached by a division of the Court. Ap-

pellant cites no authority for this position and we are not persuaded by his argument.

It is true that the government has no right to appeal in criminal cases unless specifically authorized by statute. Umbriaco v. United States, 258 F.2d 625 (9 Cir. 1958); 24 C.J.S. Criminal Law § 1659. However, this prohibition arises out of the common law and is not necessarily encompassed by the constitutional prohibition. For, as we see, 18 U.S.C. § 3731 specifically authorizes government appeals in some instances, and the exercise of this right of appeal does not necessarily violate a criminal defendant's right against double jeopardy. United States v. Bitty, 208 U.S. 393, 28 S.Ct. 396, 52 L.Ed. 543 (1908). See, United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) in which the government secured review of an adverse Court of Appeals decision.

However, we need not pursue the matter of constitutionality of government appeals in that an appellate court's reconsideration of its own position on a question of law, is far different from an appeal from a final decision of a trial court. As long as this Court has jurisdiction over the cause, it has the express authority under Title 28, U.S.C. § 46 and § 2106 and Court Rule 15 to rehear and, if necessary, modify its decisions. Ulime v. Ulime, 92 U.S.App.D.C. 281, 205 F.2d 870 (1953); 14A Cyclopedia of Federal Procedure, § 68.123 (3rd Ed., 1965 Rev. Vol.); 36 C.J.S. Federal Courts § 301 (31).

■ This Court retains jurisdiction over a cause at least until a mandate is issued in accordance with a majority opinion. Since no mandate has issued in this case, the opinion of the panel was interlocutory and the Court retains the jurisdiction necessary to question and change any tentative decisions of the Court without subjecting appellant to any form of additional jeopardy.

■ Obviously, an appellate court's reconsideration of its legal opinion is completely unlike requiring a criminal de-fendant to stand trial a second time on a factual issue after once being acquitted. See, Palko v. State of Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Consequently, it has been held by the Supreme Court that even though an appellant's conviction has been ordered reversed by a Court of Appeals, the Court of Appeals still retains the power to amend or revise that reversal order upon the rehearing of the action, and its reconsideration does not subject the criminal defendant to double jeopardy. Forman v. United States, 361 U.S. 416, 425–426, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960). This Court has jurisdiction to rehear the case and alter its judgment thereon without infringing upon appellant's constitutional rights. 12 Cyclopedia of Federal Procedure, § 51.178 (3rd Ed., 1965 Rev. Vol.).

A large number of questions on this appeal revolve around the search warrant used to uncover the incriminating evidence of gambling. Among these questions are: appellant's standing to question its validity, the sufficiency of the information before the issuing magistrate, the propriety of its execution, the failure to specify some of the evidence that was seized.

After lengthy surveillance of appellant the F.B.I. sought an arrest warrant and a search warrant. The affidavit in support of the search warrant was made before a United States Commissioner in St. Louis, Missouri, on August 18, 1965 and was signed by a Special Agent of the F.B.I. It related that the affiant or other agents of the F.B.I. observed appellant driving his automobile onto the eastern approaches of bridges leading from East St. Louis, Illinois to St. Louis, Missouri on four occasions in 1965; August 6, 11:44 a. m.; August 11, 11:16 a. m.; August 12, 12:07 p. m.; August 13, 11:08 a. m. He was observed driving off of the western end of Eads Bridge in St. Louis, Missouri on two of these occasions: August 11 and August 13.

The affiant further related that appellant had been observed by federal agents driving the car into a parking area

used by residents of the Chieftain Manor Apartments at 1108 Indian Circle Drive in St. Louis, Missouri, on August 11, 4:40 p. m.; August 12, 3:46 p. m.; August 14, 3:45 p. m.; and August 16, 3:22 p. m. On August 12 appellant was observed entering the front entrance of the Chieftain Manor Apartments. On August 13 appellant was observed entering the southwest corner apartment on the second floor designated as Apartment F. On August 16, after parking his car in the lot appellant was observed walking toward the apartment building.

After this detailed recitation of appellant's movements the affidavit went on to state:

"The records of the Southwestern Bell Telephone Company reflect that there are two telephones * * * (in apartment F) under the name of Grace P. Hagen * * *. The numbers * * * are WYdown 4–0029 and WYdown 4–0136."

"William Spinelli is known to this affiant and to federal law enforcement agents and local law enforcement agents as a bookmaker, an associate of bookmakers, a gambler, and an associate of gamblers."

"The Federal Bureau of Investigation has been informed by a confidential reliable informant that William Spinelli is operating a handbook and accepting wagers and disseminating wagering information by means of the telephones which have been assigned the numbers of WYdown 4–0029 and WYdown 4–0136."

On the basis of this information the Commissioner issued a warrant for the search of Apartment F of the Chieftain Manor Apartments. No oral testimony was taken.

Armed with the warrant the federal agents went directly to the apartment building and stationed themselves in an apartment across the hall from Apartment F. After a two hour and ten minute wait, the appellant emerged from Apartment F into the hall and was served with an arrest warrant. At the same time he was served with the warrant to search the apartment. A key found on his person was used to open the apartment door. A number of agents searched the premises, while others took appellant to police headquarters. The search uncovered various items of gambling paraphernalia which were introduced against appellant and were considered as items essential to appellant's conviction.

A motion to suppress the evidence obtained in the search was timely made and overruled by the District Court on the ground that the appellant had failed to allege or show that he was legitimately upon the premises searched, and, therefore, lacked standing to object.

## STANDING TO OBJECT

We feel the trial court did not apply the existing law and that defendant does have standing to object to the search of this apartment. In Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) the defendant was charged with violating federal narcotics statutes which permit conviction upon proof of possession of the narcotics. The Supreme Court, in overruling the trial court and the Court of Appeals, held that defendant, a guest in an apartment at the time it was searched, had standing under Rule 41(e) of the Fed. Rules of Criminal Procedure to question the validity of a search in which narcotics were seized.

To have standing to object to a search under Rule 41(e) the defendant must be the "person aggrieved" by the search. The Fourth Amendment to the Constitution is aimed at the protection of the privacy of citizens. Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Therefore, to be aggrieved by a search in violation of this Amendment a person must be able to show that his privacy was invaded by the search. Prior to *Jones*, most of the courts applied strict doctrines of common law property rights and required for standing a showing of some very significant possessory interest in the premises. *Jones*, however, supplanted this line of

authority and held that if the defendant could show that he was legally upon the premises and the fruits of the search were proposed to be used against him, his privacy had been invaded to the degree necessary to give him standing to object to the search.

In United States v. Miguel, 340 F.2d 812, 814 (n. 2) (2 Cir. 1965) cert. denied 382 U.S. 859, 86 S.Ct. 116, 15 L.Ed.2d 97, the court held that a lobby of a multi-tenant apartment was not within the protection of appellant's dwelling, but significantly stated:

> "Miguel did not own the apartment on the sixteenth floor. The tenant was Miss Almerio Lewis, who allowed appellant to stay there from time to time and keep his clothes there. This gave him standing under Rule 41(e) Fed.Rules of Cr.Proc. to object to a search of the apartment of Miss Lewis."

In Foster v. United States, 281 F.2d 310 (8 Cir. 1960) we held a person using the back room of a tavern with the consent of the manager, who was his wife, might have standing to object to the search of that room even though he was absent and his wife consented to the search.

██ We believe *Jones, Miguel,* and *Foster,* clearly indicate that it is the *right* to use the premises that is a factor determinative of standing. If the defendant is legally occupying, or has been granted a right to occupy the premises, even though he is not physically present at the time of the search, then his privacy has been invaded by a search of these premises. As a person so aggrieved by the search he has a right to object, and to do so he need not allege his specific proprietary interest, i. e., owner, lessee, business invitee, etc. Nor is he required to take the stand to establish his particular interest.

In the case before us, appellant's right to be on the premises is established by inference from the allegations in the indictment, the statements in the affidavit in support of the search warrant, and the testimony developed at the hearing to suppress. Appellant had been seen using the tenant's parking lot. He was seen entering the apartment alone on August 13, and was seen entering or approaching the apartment building on at least two other occasions. On the day the search warrant was executed appellant was alone in the apartment for at least two hours. When he was arrested immediately upon emerging from the door of Apartment F, he had a key to this apartment on his person.

█ The government's argument that appellant is not entitled to standing because he was arrested and served with the search warrant in the hall immediately outside the apartment is without merit. As we stated, the determinative factor in assessing appellant's constitutional right to privacy, and consequently his standing to object to a search, is his legal right to use these premises. The fact that appellant was in the act of voluntarily leaving the apartment when served does not weaken his right to be on these premises. Appellant's basic constitutional right of privacy cannot be circumvented by the expedient of withholding service of a warrant until the moment the accused is in the act of leaving the premises to be searched.

Consequently, we believe the evidence before the trial judge established that appellant had sufficient interest in the premises to be a "person aggrieved" by the search, and thus has standing to raise the question of the sufficiency of the showing of probable cause supporting the warrant.

## PROBABLE CAUSE

The United States Commissioner in issuing the search warrant believed from the information in the affidavit that there was probable cause to believe the law was being violated on the described premises.

█ Our duty on this appeal is not to make our independent determination of probable cause. Our duty is solely limited to the determination of whether the information before the Commissioner

was legally capable of persuading him, as a man of reasonable caution, that the laws of the United States were being violated with part of this violation consisting of an illegal act being committed on the described premises. Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

■ If the information in the affidavit, in its totality, provided the Commissioner with a substantial basis to conclude that a gambling business was being conducted on the premises and the appellant was engaged in interstate travel in connection therewith, nothing more is required of us. The finding of the Commissioner must be sustained. Rugendorf v. United States, 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

■ Upon viewing all of the information in the affidavit we do not believe we can say, as a matter of law, that the conclusion reached by the Commissioner is without substantial basis and could not possibly be drawn by a "neutral and detached magistrate". Thus the warrant must be upheld.

The affidavit, to establish an essential element of the federal crime, sets forth repeated observations of interstate travel. Four additional evidentiary facts tend to support the finding of the Commissioner that there is probable cause to believe illegal gambling activities were taking place on the described premises.

1. The affidavit set forth in detail appellant's repeated visits at approximately the same time in the afternoon to an apartment that was not his home.

2. The affidavit set forth information received from the telephone company that this apartment visited by appellant had two telephones with different numbers.

3. The affiant recited of his personal knowledge that appellant was a gambler, a bookmaker, and an associate of gamblers and bookmakers.

4. The affiant stated that the F.B.I. had been informed by a reliable informant that Spinelli was "operating a handbook and accepting wagers and disseminating wagering information by means of the telephones * * *."

We agree that if these individual pieces of information were viewed in isolation, each would probably not independently support a constitutional warrant. However, they should not be so viewed. When viewed in their totality, they together form a relatively composite picture of appellant visiting the described apartment for the purpose of conducting gambling activities. See the warrant approved in United States v. Whiting, 311 F.2d 191 (4 Cir. 1962), cert. denied 372 U.S. 935, 83 S.Ct. 882, 9 L.Ed.2d 766, and the arrest in Hernandez v. United States, 353 F.2d 624, 627–628 (9 Cir. 1965), cert. denied 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021.

As a series of seemingly innocuous bits of evidence can combine to form a web of circumstantial evidence sufficient to justify jury conviction, in the same manner independent facts can combine to form a sufficiently clear picture of a probable violation of the law to justify a magistrate in issuing a constitutional warrant. United States v. Pinkerman, 374 F.2d 988, 991 (4 Cir. 1967). See also, Christensen v. United States, 104 U.S.App.D.C. 35, 259 F.2d 192, 193 (1958); Hernandez v. United States, supra, 353 F.2d at page 628.

The repeated afternoon visits to an apartment away from one's home, could well have many legal purposes. However, it is a slightly suspicious fact warranting some note, and it takes on added significance when coupled with other known factors. Pointing out the frequently visited apartment has two telephones adds a bit more to the suspicion. Though one may have numerous legal uses for two independent telephone lines in a private apartment they are somewhat unusual, and are suspicious to the degree that multiple telephones are a common characteristic of a gambling operation. When a person who frequently

visits the apartment with the two telephones is known to be a gambler, a bookmaker and an associate of gamblers and bookmakers, vague suspicions begin to take form that gambling may be taking place in this apartment.

Finally, when the hearsay information is provided, coming from one sworn to be reliable, that the known gambler who visits the apartment with two phones is actually conducting gambling activities over these phones, setting forth the exact telephone numbers, we believe these established suspicions could validly ripen into a reasonable belief that a gambling business is being conducted on the premises. A magistrate who issues a warrant on the basis of this information is certainly not abusing the warrant process. Nor could it be said, as a matter of law, that he could not have made an independent determination of the issue. An independent determination of a magistrate has indeed been interposed between the citizen and the police. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

Of course, it could be argued that this evidence is a long way from certainty. We are, however, dealing not with certainty, but with probable cause, and:

> "In dealing with probable cause * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).

■ Probable cause is more than suspicion, but it is far less than the evidence sufficient to justify the conviction. Locke v. United States, 7 Cranch 339, 3 L.Ed. 364 (1819). In fact, the evidence in support of a warrant may consist entirely of hearsay or otherwise incompetent evidence. Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Hodgdon v. United

States, 365 F.2d 679, 684 (8 Cir. 1966); Jackson v. United States, 112 U.S.App. D.C. 260, 302 F.2d 194, 197 (1962).

■ Indeed, even less evidence is needed for the probable cause justifying the issuance of a warrant than the probable cause necessary for an officer to act without a warrant. Aguilar v. State of Texas, supra; Johnson v. United States, 333 U.S. 10, 68 S.Ct. ; 67, 92 L.Ed. 436 (1948). The exigencies of law enforcement demand that an applying officer need not prove, in a full-blown plenary hearing, that the suspect has, beyond a reasonable doubt, committed a violation of the law. He need only demonstrate a probability. We are dealing herein with a threshold of proof using layman's terms that is more than suspicion but is obviously far less than certainty.

■ Relying primarily upon Aguilar v. State of Texas, supra, appellant argues that the hearsay statement from the informer, as the core of this affidavit, cannot support the finding of probable cause. We think not. It is well established that informer statements may serve as the basis for probable cause if the statements are "reasonably corroborated by other matters" brought to the attention of the magistrate. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Rosencranz v. United States, 356 F.2d 310, 314 (1 Cir. 1967); Hodgdon v. United States, 365 F.2d 679 (8 Cir. 1966).

In the recent case of McCray v. State of Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (March 20, 1967), an informant told police officers that McCray would be on a given street corner at a particular time and that he would be in the possession of narcotics. At the appointed time McCray appeared at the designated corner and was pointed out to the officers by the informant. The officers arrested McCray without a warrant and discovered the narcotics. The majority of the Supreme Court held that the fact McCray was where the informant said he would be was sufficient circumstance underlying the informant's information to

give the officers the probable cause necessary to make a constitutional arrest.

Very similarly in Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed. 2d 327 (1959), the police were given a description of a man they were told would be carrying narcotics. When the officers went to the appointed place at the appointed time they recognized petitioner by the description given them by the informant. With nothing more they arrested appellant without a warrant and subjected him to a search. The Supreme Court determined that the officers had the necessary probable cause when the informer's reliability was verified by what they actually observed of the appellant's presence and personal appearance.

The Court has consistently demanded a higher showing of probable cause when the officer is acting without a warrant than it would if the issuance of the warrant followed the detached consideration of an independent judicial officer. Yet we note that both of these Supreme Court cases involved arrests made without warrants, followed by searches uncovering incriminating evidence. And in each the only substantiation of the informer's information was that the appellants were at a time and place specified by the informer (plus in Draper the accused corresponded to a description given by the informer). The personal observation by the officers in these cases, of course, established to a degree the basic reliability of the informer, but added no corroboration or underlying justification to the factual statement that the accuseds possessed narcotics. But regardless of the substantially higher standard of probable cause demanded of actions without warrants, these arrests were sanctioned by the Court. Certainly, the corroboration of the informers' statement in these two cases is far less than the detail corroborative facts before us, which substantiate both the informer's basic reliability and the accuracy of the factual statement that Spinelli was conducting gambling operations on the premises.

In the case before us, the informant, who was sworn to be reliable, stated that Spinelli was "operating a handbook and accepting wagers and disseminating wagering information by means of the telephones [numbered] WYdown 4–0029 and WYdown 4–0136."

This information cannot be simply classified as a conclusion. It is a statement that entails no imprimatur of a legal concept to bring into being, nor does it require the analysis of an expert. It is a simple statement of fact, using direct and simple words that cannot be reduced to a lower level of inference. Of course, it would have been preferable if the informer had buttressed his statement with additional information as to how he acquired knowledge of these facts. But this shortcoming does not mean that his statement is anything other than a simple factual summary.

Furthermore, the underlying accuracy of this hearsay statement is corroborated by the information from the telephone company that the telephone numbers recited by the informer are the numbers actually in existence and installed in the apartment. As in *McCray* and *Draper* the reliability of the informer's information is even further substantiated by the personal observations of the agents. They observed Spinelli entering the very apartment where the phones specified by the informant were located, and consequently where the illegal activity was, according to the informer's information, supposedly taking place. Finally, the allegedly conclusionary information that Spinelli was gambling on these premises is substantiated, to a degree, by the fact of Spinelli's repeated visits, the presence of the two telephones, and the personal knowledge of affiant that Spinelli was a gambler and an associate of gamblers. We believe these facts presented to the Commissioner are far stronger than those in *McCray* and *Draper* and that they combine to solidly confirm, support, verify and substantiate the accuracy and reliability of the informer's statement.

The conclusion to be drawn from an analysis of these cases is clear. Applying a higher standard of probable cause than must be applied in the case before us, the Supreme Court has upheld in *McCray* and *Draper* official police action supported by far less factual justification. Consequently, unless that Court requires a higher degree of substantiation to a lower standard of probable cause, we must assume they would declare the warrant to be constitutional. In light of the holdings in *McCray* and *Draper,* if we were to strike down the warrant in the case before us we would be requiring a more exacting standard of probable cause when the officers present their information to a magistrate and act on the authority of a warrant issued by him than we would if the officers acted on this information without securing a warrant. This is not and should not be the law.

Appellant contends that Aguilar v. State of Texas, supra, is to the contrary. We do not believe that it is. *Aguilar* is only a caveat to the general principles governing probable cause and is not a replacement of those principles. *Aguilar* was directed to the specific situation in which a warrant was based solely upon the hearsay conclusion of a third party informant, and the majority found that without elaboration of "underlying circumstances" this bare conclusion could not provide a magistrate with the substantial basis necessary for a finding of probable cause. However, there is nothing in *Aguilar* which holds that a hearsay conclusion has no probative value, and when coupled with other pieces of information that tend to substantiate the reliability of that conclusion, a valid warrant may not be issued. Miller v. Sigler, 353 F.2d 424 (8 Cir. 1965), cert. denied 384 U.S. 980, 86 S.Ct. 1879, 16 L.Ed.2d 690. In fact, footnote 1 in *Aguilar* specifically stated:

"The record does not reveal, nor is it claimed, that any other information

was brought to the attention of the [magistrate]. * * * If the fact and results of such a surveillance had been appropriately presented to the magistrate this would, of course, present an entirely different case."

As other facts and circumstances were presented to the Commissioner in the case before us, we believe it presents "an entirely different case" and is not controlled by Aguilar. See, Minovitz v. United States, 112 U.S.App.D.C. 21, 298 F.2d 682 (1962).

Riggan v. Virginia, 384 U.S. 152, 86 S.Ct. 1378, 16 L.Ed.2d 43 (1966) does nothing to alter that position. The Court in *Riggan*, without opinion, struck down an affidavit which curtly recited that the application for a warrant was based upon, "[p]ersonal observation of the premises and information from sources believed by the police to be reliable." [1] Certainly, this information in *Riggan* is little, if any, better than the bare conclusion condemned in *Aguilar*; and is far less than the detailed recital found in the affidavit before us. Nor do we believe that Gillespie v. United States, 368 F.2d 1 (8 Cir. 1966) is determinative. In that case we held that orally stating to a magistrate that the suspect had a wagering stamp and that affiant had "obtained information that he [the suspect] was currently in the gambling business", was insufficient probable cause for a warrant to search his residence.

*Riggan* and *Gillespie* set forth, at most, two evidentiary elements. *Riggan* contained: (1) personal observation (without stating what was observed), and (2) informant's information (without specifying the information). The *Gillespie* affiant stated: (1) Gillespie had a gambling stamp, and (2) an informant stated that Gillespie was currently in the gambling business (failing to set forth where the business was being conducted). However, in the case before us we have not two bare pieces of informa-

1. This information was taken from Riggan v. Commonwealth, 206 Va. 499, 144 S.E. 2d 298, 299 (n. 1) (1965). There is nothing to indicate that the recital of

facts in the opinion of Mr. Justice Clark, dissenting from the majority's per curiam reversal was actually before the issuing magistrate.

tion, but four evidentiary facts, with each fact being explained in detail not even approximated in either *Riggan* or *Gillespie*.

 Though we are convinced there was solid justification for the Commissioner's action, even if we assume this to be a close question, the Commissioner's finding is entitled to significant weight, United States v. Ramirez, 279 F.2d 712, 716 (2 Cir. 1960), cert. denied 364 U.S. 850, 81 S.Ct. 95, 5 L.Ed.2d 74, and in close cases the decisions should tip in favor of the warrant's issuance. In so holding the Court in United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) stated:

> "If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants * * * must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. * * * Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."

We believe this is a positive indication of the Supreme Court's unwillingness to further expand the requirements and technical burdens for a constitutional warrant and is certainly sound advice that should be heeded. In our view neither *Aguilar* or *Riggan* demand a reversal of this case. If we were to strike down the warrant now before us we would be taking a significant step beyond the specific demands of these cases and would be acting in direct derogation of the clear instructions in *Ventresca*.

If we were to demand further hypertechnical requirements we would approach the now discarded pitfalls of common law pleading in which the ritualistic recitation of a few essentially meaningless, but apparently "magical words", made the difference because a case being dismissed on a procedural technicality or justice being dispensed upon the merits.

We believe the holdings in *Aguilar* and *Gillespie* coupled with the established law for determination of probable cause sufficiently protect the privacy of individuals from hastily conceived intrusions.

 The Fourth Amendment was a reaction to the evils of the use of the general warrant in England and the writs of assistance in the Colonies, and was intended to protect against invasions into the privacies of life under indiscriminate general authority. Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (May 29, 1967).

Certainly, we have no unjustified invasion into the privacies of Spinelli's life under a general authority. This was no haphazard intrusion into Spinelli's affairs. The agents meticulously observed his interstate travel and his attendance at the indicated scene of gambling operations, which they had investigated to the extent necessary to corroborate the information received from various sources.

 There is no evidence in this case of an officious disregard of Spinelli's personal constitutional rights of any regard of harassment of Spinelli. Those engaged in illegal activities do not and should not have any greater rights than law-abiding citizens. Law enforcement officials are charged with the duty and responsibility of investigating those believed of engaging in criminal activity and a search warrant is but a legal tool of enforcement. Its efficacy should not be eroded by super-technical requirements that cause two trials, one on the issue of proving guilt before obtaining admissible evidence by way of a search warrant—a procedural issue, and one on the issue of guilt. Probable cause protects the innocent and need not serve as a shield for the guilty.

We believe any significant increase in the demands already placed upon securing a valid warrant are unnecessary under the present law, unneeded for the pro-

tection of individual rights of privacy, and dangerous to effective law enforcement. We believe the warrant was validly issued.

## EXECUTION OF THE WARRANT

After securing the search warrant from the United States Commissioner the federal officers went to the Chieftain Manor Apartments. They arrived at approximately 4:55 p. m. and stationed themselves in an apartment across the hall from the apartment to be searched. They waited until 7:05 p. m. when Spinelli was seen emerging from Apartment F. At this time Spinelli was arrested and Apartment F searched.

Appellant points to Rule 41(c) Fed.R.Crim.P., which demands that warrants "shall command the officer to search forthwith * * *." Appellant contends that the two hour, ten minute delay in the execution of the warrant was not a "search forthwith" as required by the rule and commanded by the warrant, and the evidence seized in the search should be suppressed.

We do not agree. Rule 41(c) and (d), Fed.R.Crim.P., provide the framework for the execution of warrants in which reasonable police latitude can be exercised. Though warrants are required to command execution "forthwith", Rule 41(d) provides that "The warrant may be executed and returned only within ten days after its date." We agree with appellant that this ten-day period is the maximum under the Rule, and the requirement of execution "forthwith", according to the facts and circumstances of each case, may indeed require search and seizure in something less than this ten-day period. However, the rule carefully refuses to set down exactly what is meant by the term "forthwith". Presumably this was left for the courts to determine on a case-by-case basis. Consistent with this flexible approach we believe that a warrant is executed "forthwith" if it is executed within a reasonable time after its issuance, not exceeding ten days. What is a "reasonable time" must be determined by the individual circumstances of each case.

A warrant is issued upon allegation of presently existing facts, and as such does not allow execution at the leisure of the police, nor does it invest the police officers with the discretion to execute the warrant at any time within ten days believed by them to be the most advantageous. Mitchell v. United States, 103 U.S. App.D.C. 341, 258 F.2d 435 (1958) (concurring opinion).

A warrant is a court order requiring the police to perform a ministerial function. They must be allowed certain leeway in the performance of this duty, but likewise they must be required to diligently perform according to the court's command. A lapse of up to ten days may be reasonable when the delay is caused by distance, traffic conditions, weather, inability to locate the person or premises to be searched, personal safety, etc. However, a delay of a few hours may be unreasonable if the police are not diligent in executing the warrant and the purpose of the delay was to prejudice the rights of a suspect.

Appellant points out that after receiving the warrant the police officers delayed execution for approximately two hours while the premises were kept under surveillance. This appellant contends was an unreasonable delay.

Certainly, at first glance, at least, the execution of a warrant on the date of issue within hours after the officers left the Commissioner's office would seem to be execution "forthwith." Neither the rule, nor the warrant require execution "immediately." While unreasonable delay cannot be countenanced, still officers must be allowed a certain latitude of action when they are on the delicate and sometimes dangerous mission of executing warrants. In this case, had the officers knocked at the door the evidence of gambling might well have been flushed down the commode before the officers could have forced their way into the apartment. In light of the necessary latitude it is very doubtful that this short

delay was unreasonable and thus constituted a failure to execute "forthwith" as required by the rule and the warrant.

■ However, the reasonableness of the officers' conduct in this case and exactly how many hours or minutes a police officer is allowed to delay execution to the prejudice of a suspect we need not decide. To object to the failure of the police to "search forthwith" the complaining party must point to some definite legal prejudice attributable to this unjustified delay. The fact that the search uncovered prejudicial evidence does not invest standing unless the presence of the evidence is attributable to the delay. Unjustified attempts by the police to prejudice the suspect by delay in execution do not provide standing unless the police are successful in their efforts. Investigative technics of the police or hypothetical harms invest no standing to suppress evidence seized in an otherwise lawful search.

As we have upheld appellant's standing to challenge the constitutionality of the warrant even though he was in the hall outside the apartment, and since appellant has demonstrated no other possible prejudice attributable to the two hour lapse, we do not believe appellant has any proper grounds to object to the short delay.

## DESCRIPTION OF THE PROPERTY SEIZED

The warrant specified for seizure "bookmaking paraphernalia, scratch sheets, bet tabs, pay and collection sheets, bookmaking records, baseball schedules, books and records of bets received, accounts, bookmaker's ledger sheets, two telephones."

■ Among the items seized which appellant contends are not included in the above specified items are, an Underwood adding machine, a pencil sharpener, a stack of blank deposit tickets on the State Bank of Wellston, a G.E. Am-FM radio, $22.00 in currency, a pair of glasses, Timex watch, pads of graph paper, four pens, two pencils, lease of the premises, and five telephones.

All of this evidence would fall, we believe, within the broad category of "bookmaking paraphernalia" set forth in the warrant. As stated in the government's brief, "Certain records are to be kept, calls to be made, computations to be determined, money to be dispensed, times to be ascertained, results to be received from various sporting engagements." All of the seized items were instrumentalities of the various facets of the bookmaking business and were properly seized as "bookmaking paraphernalia."

To the complaint that "bookmaking paraphernalia" is unconstitutionally vague, we must reply that law enforcement officials have practically no way of ascertaining in advance of a search exactly what sort of innocent, everyday materials and equipment utilized for gaming purposes might be in a private dwelling. The law cannot expect the impossible. When the circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking. The degree of specificity, thus, must vary with the circumstances and with the type of items to be seized. The specificity required for the seizure of goods whose identity is known, such as stolen goods, should not be demanded when officers are searching for such items as secreted gaming equipment, the identity of which cannot be specifically ascertained. Calo v. United States, 338 F.2d 793 (1 Cir. 1964); Nuckols v. United States, 69 U.S. App.D.C. 120, 99 F.2d 353 (1938), cert. denied 305 U.S. 626, 59 S.Ct. 89, 83 L.Ed. 401.

■ We believe a warrant describing the items to be seized simply as "bookmaking paraphernalia", under the circumstances, describes with sufficient particularity the goods for which the police are searching. The items seized under the authority of this warrant, clearly being within the generic classification of "bookmaking paraphernalia", were properly received in evidence.

## DENIAL OF A PRELIMINARY HEARING

Appellant was arrested on August 18, 1965. He was released on bond the next day and his preliminary hearing set for September 3, 1965. Upon motion of the government his preliminary hearing was continued. On September 15, 1965 the grand jury returned an indictment against appellant. Because of this indictment appellant was never afforded a preliminary hearing before the Commissioner. Appellant contends that the indictment should be dismissed as it was tainted by the government's willful avoidance of the preliminary hearing. We do not agree.

The right of indictment by grand jury is, of course, a constitutional protection afforded all persons accused of federal crimes. Standing alone this right could prove to be something of a handicap. Waiting for the relative slow procedure of grand jury indictment might require arrested individuals to spend long periods of time in jail on groundless charges. Rule 5(c), Fed.R.Crim.P. serves as a complement to the constitutionally necessary grand jury system. Though the preliminary hearing provided for in Rule 5(c) may be a practical tool for discovery by the accused, the only legal justification for its existence is to protect innocent accuseds from languishing in jail on totally baseless accusations. Therefore, before the accused may be held for grand jury presentment Rule 5(c) requires the government to justify its incarceration by proving in a preliminary hearing before a judicial officer that there is probable cause to believe the accused committed the charged offense. Barrett v. United States, 270 F.2d 772, 775 (8 Cir. 1959). If the grand jury returns a true bill prior to the time a preliminary hearing is held, the whole purpose and justification of the preliminary hearing has been satisfied. Vincent v. United States, 337 F.2d 891 (8 Cir. 1964), cert. denied 380 U.S. 988, 85 S.Ct. 1363, 14 L.Ed.2d 281. Action by a grand jury in returning the indictment brings formal charges against the accused and thus supersedes the complaint procedure and eliminates the necessity of a preliminary hearing. Jaben v. United States, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965).

Appellant admits that the Commissioner has authority to grant continuances, but argues that to grant a continuance for the purpose of obtaining an indictment is contrary to the spirit of the rules. This very question was answered to the contrary in Byrnes v. United States, 327 F.2d 825, 834 (9 Cir. 1964), cert. denied 377 U.S. 970, 84 S.Ct. 1652, 12 L.Ed.2d 739. That case held the reason behind the government's request for a continuance was speculation. Even so, the grant of a week continuance even for the purpose of allowing grand jury indictment was not improper absent a showing of legal prejudice. In the same light, we do not see anything inherently inequitable with continuing a preliminary hearing for a short period of time to allow intervening grand jury action. Though appellant might well have enjoyed the discovery benefits that flow from a preliminary hearing, he has no absolute right to these benefits if the underlying purpose of the preliminary hearing is supplanted.

As appellant in the case before us was free on bail and the indictment was returned only twelve days after the first scheduled preliminary hearing, we believe the Commissioner was well within his discretionary rights in continuing the preliminary hearing. On this issue we need go no further.

## THE INDICTMENT

Appellant charges that the indictment is laced with a multitude of defects. According to appellant 18 U.S.C. § 1952, on which the indictment is based, is so vague that it does not give adequate notice of the law and thus violates his constitutional right to due process under the Fifth Amendment. Every court faced with this argument has rejected it. The statute embraces terms of common understanding and describes a clear standard of conduct. Consequently, the

statute on which this indictment is based is not unconstitutionally vague. Bass v. United States, 324 F.2d 168 (8 Cir. 1963); United States v. Zizzo, 338 F.2d 577 (7 Cir. 1964), cert. denied 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435; Turf Center, Inc. v. United States, 325 F.2d 793 (9 Cir. 1963); United States v. Smith, 209 F.Supp. 907 (E.D.Ill. 1962).

■ Though the indictment makes its charge in one count and is framed in the language of 18 U.S.C. § 1952 appellant alleges that it violates Rule 7(c) Fed.R.Crim.P., which requires "plain, concise and definite written statement of the essential facts constituting the offense charged." An indictment couched in the terms of the statute, as this one is, is usually considered to comply with the rule. Reynolds v. United States, 225 F.2d 123 (5 Cir. 1955), cert. denied 350 U.S. 914, 76 S.Ct. 197, 100 L.Ed. 801; Brown v. United States, 222 F.2d 293 (9 Cir. 1955).

■ An indictment is good if it informs the defendant of the offense with which he is charged with sufficient specificity to enable him to prepare his defense and protects him against future jeopardy. Rood v. United States, 340 F.2d 506 (8 Cir. 1965), cert. denied 381 U.S. 906, 85 S.Ct. 1452, 14 L.Ed.2d 287. We believe this indictment, framed in the terms of the statute, measures up to that standard. Turf Center, Inc. v. United States, 325 F.2d 793 (9 Cir. 1963); United States v. Teemer, 214 F.Supp. 952 (N.D.West Va. 1963).

■■ In much the same vein appellant alleges that the trial court should have required the government to elect precisely under what provision of the statute appellant was being charged. According to appellant the indictment charges a multitude of sins and the government should elect as to whether appellant was promoting, or managing, or establishing or carrying on the unlawful activity designated. Rule 14, Fed.R. Crim.P., governing joinders, gives a District Court the power to grant the "relief justice requires", but is framed in permissive, not mandatory language. The grant of relief requiring the government to narrow its charge or elect the precise segments of the statute on which it is relying is a matter resting in the sound discretion of the trial court, the exercise of which is not subject to review unless abused. Pointer v. United States, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894). As we held, the indictment adequately informed the accused of the charges against him. The slight difficulty of preparing a defense to such broadly worded charges does not outweigh the difficulty and potential prejudice faced by the government in being forced to limit its presentations to a restricted area of proof. No abuse of discretion has been shown.

■ In an attempt to approach this problem from an alternate route, appellant moved that the government supply him with a bill of particulars pursuant to Rule 7(f) Fed.R.Crim.P. The excellent opinion of Judge (later Justice) Whittaker in United States v. Smith, 16 F.R.D. 372, 374–375 (W.D.Mo.1954), establishes the general principles in this regard. It is the proper office of a bill of particulars,

> " 'to furnish to the defendant further information respecting the charge stated in the indictment when necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial', and when necessary for those purposes, is to be granted even though it requires 'the furnishing of information which in other circumstances would not be required because evidentiary in nature,' * * *."

This liberal policy was followed when the trial court granted partial relief to appellant by ordering the government to inform him of the location, dates, and method of operation of the alleged gambling activity. This, we believe, furnished appellant with the additional information necessary to prepare his defense and avoid prejudicial surprise.

The balance of appellant's requests, however, were properly denied. A re-

fused portion of appellant's motion sought information as to the "exact nature and details of the manner in which" the promotion, management, establishment, carrying on, and facilitating the gambling activity was performed. As the government was under order to advise appellant of the necessary facts in connection with charge, he was properly informed.

On the other hand, the granting of appellant's request would have the severely damaging effect of "freezing" the government's evidence in advance of trial. See, 8 Moore's Federal Practice, § 7.06 [1]. The denial of this request for supplementary evidence was not an abuse of the trial court's broad discretion in this area. Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545 (1927).

■ Appellant also desired to discover from the government exactly how the government believed § 563.360 of the Missouri Revised Statutes was violated. The text of the statute is, of course, available to appellant, and he was also informed as to the exact dates, location and alleged method of illegal activity. Requiring the government to specify exactly how it believed appellant violated this state statute would be to require the government to disclose either its legal theory of the case or furnish unnecessary evidentiary facts as to appellant's method of operation. In either case this is not information normally securable by a bill of particulars, and thus the trial court did not abuse its discretion when the motion pertaining to this request was denied. United States v. Ansani, 240 F.2d 216 (7 Cir. 1957), cert. denied 353 U.S. 936, 77 Ct. 813, 1 L.Ed.2d 759; Kempe v. United States, 151 F.2d 680, 685 (8 Cir. 1945), cert. denied 331 U.S. 843, 67 S.Ct. 1534, 91 L.Ed. 1864.

■ Finally, appellant sought in his motion the names and addresses of other persons allegedly engaged in this gambling activity. This is a thinly veiled request for the identity of potential witnesses, and the government is not normally required to supply such information to the criminal defendant. The trial court's denial of this request was well within its permissive powers. Bohn v. United States, 260 F.2d 773 (8 Cir. 1958), cert. denied 358 U.S. 931, 79 S.Ct. 320, 3 L.Ed.2d 304.

■ Appellant contends that the indictment did not charge a crime within the spirit or intent of § 1952, as he was, at most, a single small-time gambler not engaged in an interstate business enterprise. Section 1952 makes it a federal crime to travel in interstate commerce with the intent to promote unlawful activity and thereafter attempt or commit the unlawful act. Congress defined "illegal activity" to mean, among other things, "any business enterprise involving gambling * * * in violation of the laws of the State in which [it was] committed." Other than requiring the unlawful activity, as it applies to gambling, it must be a "business enterprise."

■ Congress made no attempt to differentiate the business enterprises of a national crime syndicate and a petty hoodlum. No attempt was made to establish a minimum number of individuals that had to be involved, nor was a necessary dollar amount placed upon the illegal activity. It is virtually impossible for us to judicially specify in any meaningful fashion how large an operation a racketeer must have before he comes within the spirit of the clear prohibitions of this section. As long as it is established that a defendant is engaged in a proscribed gambling activity as a "business enterprise", we will make no attempt to draw a line between the "big time" operator, who is admittedly subject to the federal prohibitions, and the "small" operator, who, according to appellant, should remain immune from the demands of the law.

Though the statute was admittedly enacted to curb interstate racketeering, the purposes of the statute are well served by thwarting the small time interstate racketeer before he has a chance to expand his illegal activities. Therefore, if the gov-

ernment can establish the interstate travel with the requisite intent and the illegal "business enterprise" no attempt will be made by us to exempt the less prosperous enterprenuers from the operation of this statute.

The evidence indicates that Spinelli was not a casual offender engaging in a Friday night game of cards with some friends in Missouri. He was a racketeer committing regular and significant violations of the Missouri law. He made regular and repeated trips across the state line, and over a long period of time was involved in a very substantial gambling business. The prosecuting officals did not abuse their powers by bringing charges against Spinelli and the trial court properly sustained the validity of the charge.

Appellant has rather vaguely attacked the constitutionality of § 1952, on which the indictment is based, by simply listing without explanation the various constitutional provisions he believed this statute violates.

1. We have already held that the statute gives proper notice and is therefore not unconstitutionally vague.

2. There is no equal protection of law running against actions of the federal government. And the fact that a federal criminal statute is based in part upon conduct proscribed by state law does not violate due process simply because of variations in the law of the several states. Turf Center, Inc. v. United States, 325 F.2d 793 (9 Cir. 1963). See also, Clark Distilling Company v. Western Maryland Railway Company, 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (1917).

3. The statute regulating interstate travel for the purpose of engaging or controlling illegal activity is within the interstate regulatory powers vested in the federal government, and therefore is not a usurpation of the powers reserved to the states by the Tenth Amendment. United States v. Zizzo, 338 F.2d 577 (7 Cir. 1964), cert. denied 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435; United States v. Kelley, 254 F.Supp. 9 (S.D. N.Y.1966); United States v. Ryan, 213 F.Supp. 763 (D.Colo.1963).

4. The substantive violation of this statute took place when appellant crossed into Missouri with the requisite intent and thereafter attempted or committed an illegal act in Missouri. The crime was, therefore, committed in Missouri. Appellant was tried in the United States District Court for the Eastern District of Missouri. Appellant's allegation of a violation of his Sixth Amendment right to be tried in the district in which the crime was committed, has obviously not been violated.

5. As appellant has not alleged that he has been tried on this charge before, the allegation of double jeopardy has no present basis. As we have held that the statute and the indictment adequately state the nature of the proscribed conduct with which Spinelli is charged, he is fully protected against future jeopardy on these charges. He is further protected from repeated jeopardy by the fact that the allegation of violation of § 1952 is in the conjunctive. The general verdict thereon will bar any further prosecutions with respect to any of the particular allegations embraced in the broad wording of the charge. Turf Center. Inc. v. United States, supra.

6. Finally, we do not see, nor has appellant pointed out any critical relationship between the prohibitions of this statute and the First Amendment freedoms of assembly and speech. While protecting all forms of valid expression, this Amendment does not protect antisocial conduct which the government has a valid interest in proscribing. United States v. Smith, 209 F.Supp. 907 (E. D. Ill. 1962).

We believe the statute is constitutional and an indictment based thereon is valid.

POST ARREST STATEMENTS

Appellant was arrested at approximately 7:05 p. m. and was placed in the City Jail. The following morning he

was brought before the United States Commissioner and in the presence of his attorney was advised of his constitutional rights. Bail was set by the Commissioner. Thereafter, while appellant was being processed for release he was asked by Deputy United States Marshal Whitlock where he lived. Spinelli gave an Illinois address. Upon release he presented himself to F. B. I. Agent Bender and asked for the return of some keys. He indicated that one of the keys was to the "residence or the place where he was staying on the east side [Illinois]." Both of these incidents were related at trial and were introduced to prove appellant's Illinois residence and consequently the interstate travel necessary for a federal crime. Appellant objects to this evidence on the basis of the decisions in Miranda v. State of Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

Appellant was tried and convicted in March, 1966. Miranda v. State of Arizona was decided June 13, 1966. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) decided that *Miranda* should have prospective application only. Thus, *Miranda* need play no part in the consideration of the case before us. Escobedo v. State of Illinois pre-dated Spinelli's trial and its requirements would apply if applicable to the issue raised.

The exclusionary rule found in *Escobedo,* as in many other cases, is founded largely upon the proposition that the government must respect the constitutional rights of its citizens. To protect individual rights the evidence obtained in derogation thereof is not admissible in the courts. Therefore, for the exclusionary rule to apply herein, appellant need prove some unconstitutional actions by governmental officials.

In *Escobedo* the defendant was not brought before a magistrate or advised of his right to remain silent. Even though he specifically requested the advise of his attorney and his attorney was in the building attempting to see the defendant, the request for counsel was denied.

The actions of the governmental agents in the case before us can, in no way, be equated with the denial of counsel in the *Escobedo* case. A short time after being presented to the Commissioner and advised of his rights in the presence of his attorney, Spinelli voluntarily gave an Illinois address to Deputy Marshal Whitlock for the purpose of being released on bond. No request for advice or for counsel was made or denied. This request for administrative information necessary for release from custody is proper and is completely unlike and unrelated to the serious abuses found in *Escobedo*.

Furthermore, we do not believe this request for information violates appellant's Fifth Amendment privilege against self-incrimination. Appellant was not required to ask for release on bond, but if released the governmental officials have a right and duty to the public to know where appellant can be found. Appellant need not answer the questions put to him if he feels they might lead to his incrimination, but once he has decided to answer he may not retroactively claim that his privilege has been violated. Neither *Escobedo,* nor any other case of which we are aware, forbids the asking of questions simply because they could produce incriminating evidence.

■ Appellant argues that he was coerced into incriminating himself because his refusal to answer would have resulted in his being denied bail. Though we admit that appellant was faced with a difficult choice, it was a choice that necessarily had to be made. Address information prior to release on bond is an absolute necessity for the efficent administration of the bail system. When asked for this information the accused must weigh the competing circumstances and decide which course he should take.

In much the same way the accused must decide whether to testify at trial and subject himself to cross examination or remain silent. Simply because certain

advantages are to be gained by waiving Fifth Amendment rights does not mean that their waiver was coerced. The advantage which flows as a consequence of the law must be distinguished from coercive promises or threats from individual police officers. If an accused decides as a matter of free will to furnish information necessary and relevant to obtain a release on bail, it does not follow as a matter of constitutional law that this information was coerced from him.

▮ The second statement, the one given to Agent Bender, was given after Spinelli had been released on bond. This information was volunteered and not the result of any interrogation. Furthermore, as appellant was free on bond the conversation did not take place while defendant was in the custody of the police. *Escobedo* simply has no application to this set of circumstances.

It is our conclusion that neither of the pieces of evidence were obtained in violation of appellant's right to counsel or in derogation of his freedom from self-incrimination. See, United States v. Zizzo, 338 F.2d 577 (7 Cir. 1964) cert. denied 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435. As Spinelli's trial preceded the decision in Miranda v. State of Arizona, we need not decide whether the positive duties placed upon arresting officers would affect the admissibility of the evidence herein.

## ADMISSION OF EVIDENCE

▮ The admission or rejection of offered evidence is a matter generally left largely within the discretion of the trial court. Cotton v. United States, 361 F.2d 673, 676, (8 Cir. 1966). We have viewed appellant's two objections to the admission of evidence and feel neither warrants a finding by us that the trial court abused its discretion.

▮ Appellant objected to expert testimony of an F. B. I. agent concerning the gambling paraphernalia seized from the apartment. After first being qualified as an expert on gambling the government witness identified, interpreted

and explained to the jury the various exhibits and in the course of his testimony offered his opinion that these exhibits were used in the recording of wagers. Appellant contends this testimony usurped a duty of the jury.

An examination of the record indicates that gambling in the form practiced herein is a complex business using markers, codes and symbols. It is an area, we believe, little understood by, if not completely unintelligible to, the average juror. We believe explanation and interpretation of these exhibits to the jury is almost an absolute necessity if they are to reach an enlightened verdict. As such, we believe this is a proper area in which expertise may be exercised, and a properly qualified expert may offer his opinion on relevant matters concerning the operation of a gambling enterprise. United States v. Altiere, 343 F.2d 115, 119 (7 Cir. 1965), vacated on other grounds 382 U.S. 367, 86 S.Ct. 529, 15 L.Ed.2d 420; State v. Saussele, 265 S.W.2d 290, 296 (Mo.1954).

While appellant admits that evidence of criminal acts other than the one charged may be introduced to show intent or other element of the charged offense (See, United States v. Compton, 355 F.2d 872 (6 Cir. 1966), cert. denied 384 U.S. 951, 86 S.Ct. 1571, 16 L.Ed.2d 548) he contends that evidence of gambling which took place at a different location in St. Louis some seven months earlier is too remote to be admissible. We disagree.

▮ Two important elements of the charged crime are travel with the necessary intent and the existence of an illegal gambling "business enterprise". The prior connection of appellant to gambling activity conducted elsewhere tends to prove the lack of innocent purpose in his present venture. It further tends to prove that he was involved in a continuing "business enterprise" rather than a single incident of gambling.

▮ The remoteness of the time and place are primarily matters going to the weight rather than the admissibility of

the evidence. Only if the remoteness destroys the probative worth of the evidence, need it be rejected, and this is a matter left to the discretion of the trial court. King v. United States, 144 F.2d 729 (8 Cir. 1944), cert. denied 324 U.S. 854, 65 S.Ct.711, 89 L.Ed. 1413. We do not believe we can say as a matter of law that the passage of seven months places the prior activity at a time so remote that it destroys the probative value of the evidence to a degree that the trial court abused its discretion in admitting it. See, Medrano v. United States, 285 F.2d 23 (9 Cir. 1960), cert. denied 366 U.S. 968, 81 S.Ct. 1931, 6 L.Ed.2d 1258.

## INSTRUCTION

■■■ Among other things § 563.360 of Missouri Revised Statutes, 1959 V.A.M.S. provides: "* * * [A]ny person who in this state records or registers a bet or wager or sells pools upon the results of any trial or contest * * * shall, on conviction, be adjudged guilty of a felony * * *."

The Court instructed the jury as follows:

"If you, the jury, find and believe from the evidence and beyond a reasonable doubt that the defendant did *engage in accepting wagers on athletic contests and in furnishing odds or point spreads on athletic contests as a business enterprise,* then I instruct you that such activity violates the law of Missouri, as set out in Section 563.360 of the Missouri Revised Statutes of 1959 [V.A.M.S.]."

Appellant alleges that this instruction is erroneous in that the Missouri law does not declare to be illegal "the furnishing of odds and point spreads on athletic contests."

The statute does forbid the registering of bets and the selling of pools, and the instruction on "accepting wagers" correctly related the law of Missouri on this point. Further, a necessary included part of "accepting wagers" might well be the furnishing of odds and point spreads. Though not specifically forbidden by the wording of the statute this is but a facet and part of the broader prohibition against gambling.

Furthermore, the language appellant finds objectionable required the government to prove not only the acceptance of wagers, as this was all that was necessary to prove a state law violation, but required the government to prove that appellant had furnished odds and point spreads. Rather than expanding the statute as appellant charges, the government was required to assume an unnecessary burden of proof, which was mere surplusage that inured to the benefit of appellant.

## SUFFICIENCY OF THE EVIDENCE

In determining sufficiency of evidence to support a verdict of guilty, the evidence must be viewed in a light most favorable to the government. We believe the evidence so viewed validly supports appellant's conviction.

■■■ There are three basic elements to the federal crime charged:

1. Interstate travel;
2. Intent (to promote, direct, or manage illegal business);
3. Overt act (in attempting or participating in the illegal business).

Appellant admits the sufficiency of the evidence of his interstate travel, but contests the sufficiency of the evidence indicating intent at the time of travel or the overt act following the travel.

■■■ To prove intent the government properly introduced evidence of appellant's involvement in a prior gambling operation which took place some seven months before the offense charged herein. The evidence of the present violation indicates that appellant periodically visited this apartment, and it indicates that gambling operations were obviously taking place therein. Though there is some evidence that appellant came into Missouri to visit his broker, certainly there is sufficient evidence allowing the jury to infer that the purpose of the trip was motivated by the gambling operation. This was an issue of fact re-

solved by the jury against appellant and it will not be disturbed by us.

Proof of the overt act is indicated by inference from proof of appellant's numerous visits to this apartment and proof that this apartment was the scene of recent and comprehensive gambling activities. On the day of his arrest appellant had a key to the door of this apartment and was in the room alone with this gambling paraphernalia for well over two hours. This evidence would certainly allow the jury to infer that after crossing into Missouri with the requisite intent, appellant attempted or committed acts in the promotion, management, establishment or carrying on of gambling activity in violation of Missouri law. All that needs to be proved is some overt act directed to the illegal gambling activity. It is not necessary that appellant actually be witnessed placing or receiving a wager. The evidence supports the conviction.

Judgment affirmed.

HEANEY, Circuit Judge, with whom VAN OOSTERHOUT, Circuit Judge, concurs, dissenting:

We respectfully dissent. In our opinion, the decisions of the United States Supreme Court in Riggan v. Virginia, 384 U.S. 152, 86 S.Ct. 1378, 16 L.Ed.2d 43 (1966), United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) and Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and the decision of this Court in Gillespie v. United States, 368 F.2d 1 (8th Cir. 1966), require a reversal of the District Court as the affidavit submitted in support of the search warrant did not provide a substantial basis for its issuance.

The majority opinion concedes that the "visits" to the apartment, the presence of the two telephones in the searched apartment, and the affiant's personal knowledge that the defendant was a known gambler are, at the most, *established suspicions*. As such, they are not sufficient to constitute probable cause for the issuance of a search warrant. Locke v. United States, 7 Cranch. 339, 3 L.Ed. 364 (1819); See Pigg v. United States, 337 F.2d 302, 305 (8th Cir. 1964); Crochran v. United States, 291 F.2d 633, 636 (8th Cir. 1961).

It argues, however, that the "suspicions" were ripened into probable cause by the affiant's statement that the F.B.I. had been informed by an unidentified reliable informant that Spinelli is "operating a handbook and accepting wagers and disseminating wagering information" by means of the two telephones assigned numbers WYdown 4-0029 and WYdown 4-0136.

Conversely, it argues that the "suspicions" served to corroborate the conclusions of the unidentified informant and establish his reliability.

We cannot agree with either contention.

The Fourth Amendment's right [1] of the people to be secured against the unreasonable searches of their persons, houses, [2] papers, and effects, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961); Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed.

---

**1.** The Fourth Amendment reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The policy expressed in this amendment finds expression in Rule 41 of the Federal Rules of Criminal Procedure.

**2.** The Supreme Court has refused to uphold otherwise unreasonable criminal searches merely because commercial, rather than residential, premises were the object of the police intrusions. See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

652 (1914), extends to the guilty as well as the innocent. McDonald v. United States, 335 U.S. 451, 453, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Hobson v. United States, 226 F.2d 890, 892 (8th Cir. 1955).

While the use of search warrants is to be encouraged, United States v. Ventresca, supra, a magistrate must perform his duties neutrally; he "must not serve merely as a rubber stamp for the police." Id., 380 U.S. at 109, 85 S.Ct. at 746; Aguilar v. State of Texas, supra, 378 U.S. at 111, 84 S.Ct. 1509; Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

"* * * It is not the magistrate's function, therefore, merely to determine whether the official seeking the warrant believes that probable cause exists; rather, the magistrate must ask whether the facts presented persuade *him* that there is probable cause. * * *" United States ex rel. Rogers v. Warden, No. 30874, 2d Cir., June 15, 1967, 381 F.2d 209.

A proceeding by search warrant is a drastic one, Sgro v. United States, 287 U.S. 206, 210, 53 S.Ct. 138, 77 L.Ed. 260 (1932), and must be carefully circumscribed. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

With these general principles in mind, we consider whether the magistrate here had probable cause to issue a warrant to search Apartment F of the Chieftain Manor Apartments.

As the only information before the magistrate when he issued the search warrant was that set forth in the affidavit, the sufficiency of the affidavit must be determined from its face. Aguilar v. State of Texas, supra, 378 U.S. at 109, n. 1, 84 S.Ct. 1509; Giordenello v. United States, supra.

While hearsay may be the basis for the issuance of a search warrant, Jones v. United States, 362 U.S. 257, 272, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), if it is relied upon to establish probable cause, the magistrate must be informed of some of the underlying circumstances supporting the affiant's conclusions, and his belief that any informant involved was credible or his information reliable. United States v. Ventresca, supra; Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); Gillespie v. United States, supra. See Annot. 10 A.L.R.3d 359 (1966).

Applying the standards set forth in *Ventresca, Rugendorf* and *Gillespie* to the informant's statement in the present case, it is clear that it was not sufficient to justify a finding of probable cause by the magistrate. The affidavit in which it was contained:

(1) *Failed to set forth any basis upon which the magistrate could form an independent opinion of the informant's reliability, or on which he could find that the informant had furnished information in the past which had proved to be reliable.*

In McCray v. State of Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), where the Supreme Court found the informant to be reliable, the informant had furnished information to police officers forty or more times, which information had proved to be reliable in the past and had resulted in conviction.

And, in United States ex rel. Rogers v. Warden, supra, 381 F.2d 209, rev'd on other grounds, the Second Circuit found the unidentified informant to be reliable on the basis that the affidavit indicated that he had furnished information in the past which had resulted in three convictions. Compare United States v. Robinson, 325 F.2d 391 (2d Cir. 1963); and Cochran v. United States, supra, where the reliability of an informer was held not to have been established.

In *Cochran*, Chief Judge Vogel, writing for this Court, declared:

"'* * * An uncorroborated tip by an informer whose identity and reliability are both unknown does not constitute probable cause to make an arrest.' Contee v. United States, 1954 [94 U.S.App.D.C. 297], 215 F.2d 324, 327." Id., 291 F.2d at 636.

The affidavit in the present case contained only a simple allegation that the unidentified informant was reliable. There was nothing in it from which the magistrate could have determined that the informant had furnished reliable information in the past, nor were any facts set forth from which such an inference could be drawn. United States ex rel. Schnitzler v. Follette, 267 F.Supp. 337, 342 (S.D.N.Y.1967); See State ex rel. Duhn v. Tahash, 275 Minn. 377, 147 N.W.2d 382 (1966).

(2) *Failed to (a) indicate whether the informant spoke on the basis of his personal knowledge, or (b) to outline any of the underlying circumstances upon which the unidentified informant based his statement that illegal activity was taking place on the premises searched.*

(a) In Riggan v. Virginia, supra; Aguilar v. State of Texas, supra, 378 U.S. at 109, 84 S.Ct. 1509; and Gillespie v. United States, supra, 368 F.2d at 3, the informant's statements were substantially the same as the one here.[3] In Aguilar, the Court, in pointing out that the affidavit failed to indicate whether the informant spoke from his own personal knowledge, stated:

"The vice in the present affidavit is at least as great as in *Nathanson* and *Giordenello*. Here the 'mere conclusion' that petitioner possessed narcotics was not even that of the affiant himself; it was that of an unidentified informant. The affidavit here not only 'contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein,' it does not even contain an 'affirmative allegation' that the affiant's un-

identified source 'spoke with personal knowledge.' For all that appears, the source here merely suspected, believed or concluded that there were narcotics in petitioner's possession. The magistrate here certainly could not 'judge for himself the persuasiveness of the facts relied on * * * to show probable cause.' He necessarily accepted 'without question' the informant's 'suspicion,' 'belief' or 'mere conclusion.' " Id., 378 U.S. at 113–114, 84 S.Ct. at 1513.[4]

(b) The same Court, in laying down the need for the magistrate to be informed of some of the underlying circumstances supporting the informant's conclusions, stated:

" * * * the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see Rugendorf v. United States, 376 U.S. 528, [11 L.Ed.2d 887,] 84 S.Ct. 825, was 'credible' or his information 'reliable.' Otherwise, 'the inferences from the facts which lead to the complaint' will be drawn not 'by a neutral and detached magistrate,' as the Constitution requires, but instead, by a police officer 'engaged in the often competitive enterprise of ferreting out crime,' Giordenello v. United States, supra, 357 U.S. at 486, 78 S.Ct. 1245 [2 L.Ed.2d at 1509]; Johnson v. United States, supra, 333 U.S. at 14, 68 S.Ct. at 369 [92 L.Ed. at 440], or, as in this case, by an unidentified in-

---

3. In Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the affidavit in relevant part read:
"Affiants have received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law."

4. The majority opinion urges that the informant's statement to the affiant that Spinelli was "operating a handbook and accepting wagers and disseminating wagering information by means of the telephones (numbered) WYdown 4–0029 and WYdown 4–0136," was a statement of fact and not a conclusion. We believe it to be a statement similar to that in the *Aguilar* affidavit which the Supreme Court referred to as a conclusion.

formant." Id., 378 U.S. at 114–115, 84 S.Ct. at 1514.

In United States v. Ventresca, supra, where the Court found that the underlying circumstances had been adequately set forth, the affidavit stated that the informants, unidentified Revenue Agents, had smelled fermenting mash outside the premises searched on August 18th and 30th; saw bags of sugar being delivered to the premises on July 28th, August 2nd, 7th and 16th; and observed tin cans being taken to and from the premises on August 11th, 16th, 24th and 28th. The Court cautioned:

> "This is not to say that probable cause can be made out of affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based. See Aguilar v. State of Texas, supra. Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. * * *" Id., 380 U.S. at 108–109, 85 S.Ct. at 746.

See United States v. Conti, 361 F.2d 153 (2d Cir. 1966) (where the affiant personally placed bets with the defendant).

(3) *Failed to indicate when the informant became aware of the fact that illegal activities were taking place in the apartment, or when the informant gave this information to the affiant.* The fact that the affidavit and the informant's statement was couched in the present tense does not satisfy this requirement. See Sgro v. United States, supra, 287 U.S. at 210–211, 53 S.Ct. 138; Schoeneman v. United States, 115 U.S. App.D.C. 110, 317 F.2d 173 (1963).

In Rosencranz v. United States, 356 F.2d 310 (1st Cir. 1966), the leading case on the issue of time, the affidavit for the search warrant read, insofar as material, as follows:

> " * * * he has reason to believe that on the premises * * * there *is now being concealed* certain property, namely mash fit for distillation, apparatus for the purpose of distillation and nontax paid alcohol which are held in violation of Title 26, U.S.C. Sec. 5601 (a), (1) (6), (7), (8), (12):

> "And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

> "1. Information given anonymously to the Affiant that the aforementioned materials are being held on said premises.

> "2. The detection of a strong odor of mash outside the premises by the Affiant." Id. at 312, n. 1. (Emphasis added.)

The Court there held that the affidavit was not sufficient to establish probable cause because it did not contain an averment as to the time when the affiant received information from his anonymous informant, or the time when the affiant detected the order of the mash. It stated that the use of the present tense was not sufficient. The Court, after making a detailed examination of the cases dealing with this question, stated:

> " * * * The present tense is suspended in the air; it has no point of reference. It speaks, after all, of the time when an anonymous informant conveyed information to the officer, which could have been a day, a week, or months before the date of the affidavit. To make a double inference, that the undated information speaks as of a date close to that of the affidavit and that therefore the undated observation made on the strength of such information must speak as of an even more recent date would be to open the door to the unsupervised issuance of search warrants on the basis of aging information. * * * Indeed, if the affidavit in this case be adjudged valid, it is difficult to see how any function but that of a rubber stamp remains for them.

> * * * * * *

> " * * * It is one thing to expect the magistrate to give a commonsense

reading to facts set forth and to draw inferences from them. It is quite another thing to expect the magistrate to reach for external facts and to build inference upon inference in order to create a reasonable basis for his belief that a crime is presently being committed." Id. at 316–317.

In the present case, although the affiant's statement indicates when he saw Spinelli traveling from Illinois to Missouri, and when he observed him visiting the apartment complex and the apartment, it is silent as to when the affiant learned from the informant that Spinelli was using the phones in Apartment F for illegal activities, or when such activity took place. Just as the *Rosencranz* Court stated that it could not infer from the date of the affidavit that the information had been passed at or near that date,[5] we cannot infer from this affidavit that the anonymous information was transmitted to the affiant at or near the date the warrant was requested, nor can we infer that the informant's "knowledge that the two phones were being used by Spinelli" was correct. Thus, the informant's statement here, as in *Rosencranz*, is "suspended in the air."

In summary, we do not believe that the unidentified informant's statement to the affiant can be used for any purpose. Not only did the affidavit fail to establish the reliability of the informer, but there was no showing that the informer spoke from his own personal knowledge. None of the underlying circumstances supporting the informer's belief were set forth, and the affidavit failed to indicate when he received or passed on the information that Spinelli was conducting gambling activities over the two phones in question. While we do not agree with the majority that the informant's reliability was established by his knowledge of the existence of the phone numbers in the apartment searched, even if this view is accepted, the informant's statement is totally unacceptable for the other stated reasons: [6]

Nor do we believe that the facts stated in the affidavit, obtained by the affiant through surveillance, rise above the level of suspicion whether considered with or without the informant's conclusion.

(1) Interstate travel between East St. Louis, Illinois, and St. Louis, Missouri, is surely so common that it cannot be viewed as establishing an unusual pattern of travel from which illegality can

---

5. Judge Coffin asks a pertinent question in *Rosencranz*:
 "* * * But suppose a commissioner, on the basis of an affidavit * * * were to infer that both affiant's information and observation were recent, while at a hearing on a motion to suppress, affiant states that both *information and observation were several months old*. There would, in fact, have been no basis for issuing the warrant, and yet the affidavit would have been accurate and the affiant would be in no danger of prosecution for its falsity. * * *" Id. at 317.

6. The majority opinion cites Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Rosencranz v. United States, 356 F.2d 310 (1st Cir. 1966); and Hodgdon v. United States, 365 F.2d 697 (8th Cir. 1966), in support of the proposition that the hearsay information obtained from the unidentified informant had been sufficiently corroborated here to establish probable cause. A reading of

these cases indicates that in each case, either the informant or the affiant had *personally* observed illegal activities in or near the premises to be searched.

Thus, in *Jones*, the informant stated that he had purchased narcotics from the defendant in the defendant's apartment on a number of occasions, the most recent one being a day prior to the issuance of the search warrant. He detailed precisely where in the apartment the narcotics were kept.

In *Rosencranz* (reversed on other grounds), the informant's conclusory statement, that the defendant was operating a still, was corroborated by the personal observations of the affiant (a law enforcement agent) who smelled the strong odor of mash outside of the premises of the appellant.

And in *Hodgdon*, the informant (a U.S. Court Commissioner) told the affiant (a law enforcement officer) that he had been threatened with a gun the previous day by the defendant while alone in his office with the defendant.

be inferred. Compare Travis v. United States, 362 F.2d 477 (9th Cir. 1966) (defendant established a definite pattern or *modus operandi*); and Hernandez v. United States, 353 F.2d 624, (9th Cir. 1965).[7]

(2) Four observed visits to the apartment complex and one such visit to Apartment F, absent *any* showing of activity indicating that bookmaking activities were taking place in the apartment, does not, in our judgment, add support for a probable cause finding.

The Second Circuit, in Rogers v. Warden, supra (reviewing a petition for habeas corpus), effectively overruled a decision of the New York Court of Appeals where the facts indicated that a police officer had personally observed four known addicts and nine other persons entering or leaving the premises searched over a two-day period, even though the affidavit, as here, stated that the affiant had received information from an informant, known to be reliable, that the defendant, and others were selling narcotics in the first floor and basement apartment.[8] The Court, in holding that the warrant failed to establish probable cause, stated:

"* * * there is not a hint in the present affidavit that the informant had seen any trafficking in narcotics taking place in Rogers' apartment. It is difficult for us to understand, therefore, the basis for the inference drawn

---

7. A large number of facts coalesced in Hernandez v. United States, 9 Cir., 353 F.2d 624 (1965), to form probable cause for the arrest and search of the defendant's bags. Los Angeles police had observed a recurring pattern in incidents involving illicit transportation of marihuana. Large lots were being brought to Los Angeles from Mexico by auto, then carried from Los Angeles to New York City in the luggage of persons traveling on commercial air flights. It was established that the couriers (1) were Latin Americans, (2) traveled first class, (3) traveled on nonstop flights, (4) made no advance reservations, (5) carried new and expensive luggage, (6) carried luggage which usually bore the brand name "Ventura," (7) carried luggage which usually had combination locks, (8) carried luggage which was exceedingly heavy because of the weight of the marihuana, and (9) paid their fares and weight overcharges in cash with bills in large denominations. Eight such cases had been investigated in the two years preceding the appellant's apprehension. Airport employees were asked to notify the police if a person fitting the described pattern appeared. The appellant appeared, was arrested, his bags searched, and a large quantity of marihuana was uncovered. In commenting on the search and seizure, the Court, at 628 stated:

"* * * The circumstances upon which Sergeant Butler relied were within his knowledge *before* the search was initiated, and were sufficient to justify a reasonable man in believing that the very bags which he did search contained marihuana."

8. The affidavit in Rogers v. Warden, No. 30874, 2d Cir. June 15, 1967, 381 F.2d 211 n. 1 read in part:

"1. I am a detective assigned to the Brooklyn District Attorney's Off.

"2. I have information based upon confidential information received from an an [sic] informant known to be reliable and accurrate [sic] and whose information in the past has led to the arrest and conviction of three persons. The information is that Jimmy Rogers and other persons found in said apartment are selling narcotic drugs in the 1st fl. & basement apartment of premises 191 Quincy St., Brooklyn, N. Y. Observations by the deponent on the premises on Thursday, January 10, 1963, between the hours of 8:00 and 9:00 P.M. five unknown males and two known male addicts were seen entering the premises; on January 11th, 1963, from 9:00 to 11:00 A.M. four unknown males and two known male addicts.

"By reason of the aforesaid the deponent has probable cause to believe that narcotic drugs and paraphernalia commonly used by drug sellers and addicts may be found at the aforesaid premises and upon the persons found therein.

"3. Based upon the foregoing reliable information and upon my personal knowledge there is probable cause to believe that such property, to wit, narcotic drugs and paraphernalia commonly used by drug addicts and sellers and [sic] may be found in the possession of Jimmy Rogers and upon the persons found therein or at premises first floor and basement of 191 Quincy Street, Brooklyn, N. Y."

by the Appellate Division and the New York Court of Appeals that the informant spoke of what he had seen, for the 'deficiencies [in the affidavit] could not be cured by the * * * reliance upon a presumption that the complaint was made on the personal knowledge of the [informant].'" Id. at 218 of 381 F.2d.

\* \* \* \* \* \*

"Since it is apparent that Rogers lived in an 'apartment' building, it is obscure, vague and at the very least equivocal whether Gowski actually observed the unknown males and known addicts entering Rogers' 'apartment,' or whether he merely saw them entering the 'premises,' * * *" Id. at 219.

\* \* \* \* \* \*

"It can be argued, of course, that when Gowski stated that he had observed the 'premises,' he was really talking about the 'apartment.' We recognize that affidavits are often hastily drawn and that we cannot expect a police officer to draft an affidavit with the skill and precision of a lawyer. * * * Nevertheless, the simple fact remains that from the affidavit before us, neither we nor the magistrate who issued the warrant could be reasonably certain what it was that the officers observed, and there is nothing to indicate that the magistrate attempted to make any

inquries to resolve the ambiguity that existed. * * *" Id. at 220.

The issuance of a search warrant must be based on more specific evidence than was provided in the present instance. As we stated earlier, in United States v. Ventresca, supra, government agents *smelled* the odor of fermenting mash in the vicinity of the suspected dwelling, and *observed* other activities suggesting the operation of a still. In Miller v. Sigler, 353 F.2d 424, 426–427 (8th Cir. 1965), the affiant *smelled* the odor of marihuana outside the premises searched on a number of occasions. In Biondo v. United States, 348 F.2d 272–273 (8th Cir. 1965), the defendant was *observed* carrying racing forms into the apartment. In United States v. Pinkerman, 374 F.2d 988, 990 (4th Cir. 1967), the affiant *saw* barrels and *smelled* mash outside the premises. In United States v. Ramirez, 279 F.2d 712–715 (2d Cir. 1960), the affiant personally *saw* quantities of white powder he believed to be heroin in the apartment to be searched two days before the warrant was issued. In United States v. Rugendorf, supra, a reliable informant told the affiant he *saw* furs, alleged to have been stolen, in the defendant's basement a few days before the search.[9]

(3) The fact that two telephones were located in the vested apartment does not, in this day and age, in the absence of some specific evidence of how the phones were used or the presence of unusual

---

9. In United States v. Jordan, 349 F.2d 107 (6th Cir. 1965), the officers *observed* the transfer of jugs and *smelled* the odor of mash emanating from the premises. In United States v. Freeman, 358 F.2d 459 (2d Cir. 1966), the heroin was *seen* within the premises to be searched by the informant. In United States v. Grosso, 358 F.2d 154 (3rd Cir. 1966), known numbers operators *were observed* depositing envelopes and brown paper bags in a car near a cemetery. In Irby v. United States, 114 U.S.App.D.C. 246, 314 F.2d 251 (1963), the affiant *observed* the government's special employee taking money from known addicts and the employee turned over narcotics obtained with the money prior to the issuance of a warrant. In United States v. Gorman, 208 F.Supp. 747 (E.D.Mich.1962), sev-

eral others engaged in handbook activities *were seen* entering the apartment alone or with the defendant. In United States v. Whiting, 311 F.2d 191 (4th Cir. 1962), a convicted gambler *was observed* making contact with the defendant under suspicious circumstances by the affiant. In United States v. Suarez, 2d Cir., July 12, 1967, 380 F.2d 713, the affidavit related that the reliable informant had provided information on at least *100 occasions* over the past one and one-half years and *had observed* heroin in the apartment to be searched. See United States v. Ramos, 2d Cir., July 12, 1967, 380 F.2d 717, and United States v. Perry, 2d Cir., July 12, 1967, 380 F.2d 356, where the affidavit contained information comparable to that in United States v. Suarez, supra.

equipment, constitute probable cause for the issuance of a search warrant. United States v. Gebell, 209 F.Supp. 11 (E.D. Mich.1962). See United States ex rel. DeNegris v. Menser, 360 F.2d 199, 203 (2d Cir. 1966); United States v. Nicholson, 303 F.2d 330 (6th Cir. 1962), compare United States v. Gorman, 208 F. Supp. 747–748 (E.D.Mich.1962), where numerous long distance telephone calls with known bookmakers were consummated over the phones in question; Biondo v. United States, supra, 348 F.2d at 274, where unusual telephonic equipment was in use; and, United States v. Conti, supra, where the affiant placed bets by making a phone call to the apartment searched.

(4) The fact that the appellant was known to the affiant and other law enforcement agents as a bookmaker, and an associate of bookmakers, would, if supported by some credible evidence, be a factor which a magistrate might consider, Jones v. United States, supra, 362 U.S. at 271, 80 S.Ct. 725, but here, we have no such supporting evidence.

The majority relies heavily on McCray v. State of Illinois, supra; and Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), in support of its opinion. We believe that these cases do not support a finding of probable cause here; rather, we feel that they suggest a contrary result.

At the outset, we point out that Draper was followed by Aguilar v. State of Texas, supra; Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); United States v. Ventresca, supra; and most recently by McCray v. Illinois, supra. Thus, *Draper* must be read in light of these subsequent cases. There are several factors which distinguish *Draper* from the present case:

(1) In *Draper,* the informant was a *named* special employee of the federal

narcotics agents;[10] here, the informant was unidentified.

(2) In *Draper,* the informant had given reliable information to the federal agents on numerous occasions over a six-month period, and the information had *always* been found to be reliable. Here, we have a mere allegation of reliability.

(3) In *Draper,* the informant told the arresting officer, on September 3rd, that the defendant had taken up residence in the city, and was peddling narcotics to several residents of the city. Four days later, the informant told the arresting officer that the defendant had gone to Chicago the day before, and that he would bring back three ounces of heroin; and that he would return on the morning of September 8th or 9th. He described in exact detail the defendant's dress and baggage.

Here, the informant gave no information as to when Spinelli had used the telephones for illegal purposes, or when they would be so used in the future, nor does the affidavit indicate when the informant told the F.B.I. Agent that Spinelli "is using the phones for gambling."

(4) Finally, the information supplied by the informant in *Draper* is so precise that it obviously came from one intimately familiar with the defendant's activities; while here, the information from the informant regarding the phone numbers in Apartment F is of such a general nature that it could have been obtained from any one of a number of sources, including the phone book, or another unidentified informant.

Five years after *Draper,* Justice Stewart, speaking for the Court in Beck v. State of Ohio, supra, where it refused to find probable cause, focused on the essential elements in *Draper* which

---

10. Justice Goldberg, speaking in United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965), stated:

"* * * Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number. * * *"

caused the Court to find probable cause for the arrest. Justice Stewart declared:

" * * * But in that case the record showed that a named special employee of narcotics agents who had on numerous occasions given reliable information had told the arresting officer that the defendant, whom he described minutely, had taken up residence at a stated address and was selling narcotics to addicts in Denver. The informer further had told the officer that the defendant was going to Chicago to obtain narcotics and would be returning to Denver on one of two trains from Chicago, which event in fact took place. * * * " Id., 379 U.S. at 95, 85 S.Ct. at 227.

In *Beck*, the arresting officer had a police photo of the suspect, knew what the suspect looked like, knew that the petitioner had a record in connection with clearing house schemes and schemes of chance, and had received information regarding the suspect's activities from an undisclosed source. In reversing the conviction, the Court said:

" * * * But the officer testified to nothing that would indicate that any informer had said that the petitioner could be found at that time and place. Cf. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327. And the record does not show that the officers saw the petitioner 'stop' before they arrested him, or that they *saw, heard, smelled or otherwise perceived anything else* to give them ground for belief that the petitioner had acted or was then acting unlawfully." Id. at 94, 85 S.Ct. at 227. (Emphasis added.)

\* \* \* \* \* \*

" * * * All that the trial court was told in this case was that the officers knew what the petitioner looked like and knew that he had a previous record of arrests or convictions for violations of the clearing house law. Beyond that, the arresting officer who testified said no more than that someone (he did not say who) had told him something (he did not say what) about the petitioner." Id. at 96–97, 85 S.Ct. at 228.

*Beck* was followed by *McCray,* where the Supreme Court also found probable cause. In doing so, it noted that the unidentified informant had given information to the police on at least forty prior occasions; the information had resulted in a number of convictions; the informant personally observed the defendant selling narcotics and immediately informed the police, who proceeded forthwith to where the affiant had seen the defendant, and after observing the defendant, arrested him.

When *Draper, Beck* and *McCray* (all non-warrant cases) are considered together, they indicate that the Supreme Court will find probable cause where the informant is shown to be reliable, the information furnished by him is precise as to time and place, and is either based on the informant's personal knowledge or is so specific as to indicate that the informant is intimately familiar with the defendant's operations, and the police have acted promptly upon receiving the informant's tip.

Here, there is no showing that the unidentified informant had submitted reliable information to the police in the past. The information furnished by him was conclusory in nature, and it does not appear that it was based on his personal knowledge. And, finally, the affidavit does not indicate whether the police acted promptly on receipt of the information from him.

## CONCLUSION

We share the feelings of our colleagues that affidavits presented to a magistrate, to establish probable cause for the issuance of a search warrant, must be viewed in a commonsense matter.

When we read the affidavit here, at least three commonsense questions occur to us. We feel the same questions ought to have occurred to the magistrate.

(1) How did the affiant know that the informant was reliable?

(2) How did the affiant know that Spinelli was using the two telephones to conduct his operations in Apartment F?

(3) When did the informant obtain this information; and when did he transmit it to the affiant?

We cannot believe that we are being hypertechnical by insisting that these basic questions be answered.

It is important that the use of search warrants be encouraged. It is equally important that magistrates satisfy themselves that there is reasonable cause for believing that illegal activity is taking place on the premises to be searched before issuing search warrants.

We concur with the majority that the defendant had standing; but as it is our belief that probable cause did not exist for the issuance of the search warrant and as this determination is dispositive of the case, we express no opinion on the other issues raised by the appellant.